Manchester District Court
No. 2009-027

THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER HORAK

Argued: November 17, 2009
Opinion Issued: January 14, 2010

*Orville B. Fitch, II*, acting attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Christopher Horak, appeals his conviction of sexual assault for engaging in sexual contact with a person thirteen years of age or older whom he knew to be mentally defective. *See* RSA 632-A:4, I(a), :2, I(h) (2007). We reverse and remand.

The Manchester District Court (*Champagne*, J.) could have found the following facts. At the time of the assault, the defendant lived with the complainant and her mother and had been the boyfriend of the complainant's mother for nine years. The complainant, who was then twenty-two years old, was born with disabilities and required daily care such as changing her diapers and assistance with showering, dressing and brushing her teeth. On weekdays, while her mother worked, the complainant attended the Moore Center, an organization providing services for people with acquired brain disorders and developmental disabilities.

On April 24, 2008, the complainant's mother dropped the complainant off at the Moore Center. The complainant was crying and informed her nurse about an incident that had occurred with the defendant that morning. The police were contacted, and the defendant was charged by complaint with having committed sexual assault, in that:

> [The defendant did] [p]urposely engage in sexual conduct with [the complainant] 08/18/85, whom he knows to be mentally defective, to wit: did expose his bare penis to her and then told her to touch his bare penis, to which she complied, which can be reasonably construed as being for the purpose of sexual arousal or gratification.

The defendant was tried in Manchester District Court and convicted. On appeal, he argues that the trial court erred in: (1) finding that the State proved both that the complainant was mentally defective and that the

defendant knew she was mentally defective; and (2) ruling that the complainant was competent to testify. We address the second issue first.

██ "Whether a witness is competent to testify is a question of law for the trial court." *State v. Mills*, 136 N.H. 46, 49 (1992). "Where the record supports the court's determination of competency, we will not disturb that determination absent an [unsustainable exercise] of discretion." *State v. Aikens*, 135 N.H. 569, 571 (1992) (quotation omitted); *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). "Because so much depends on the trial court's firsthand observations of the witness, its conclusion that the witness is competent is entitled to great deference." *State v. Briere*, 138 N.H. 617, 620 (1994).

██ Under New Hampshire Rule of Evidence 601, "[w]itnesses are presumed competent to testify, . . . [a]lthough this presumption may be overcome by findings that the witness 'lacks sufficient capacity to observe, remember and narrate as well as understand the duty to tell the truth'. . . ." *Id.* (quoting N.H. R. Ev. 601(b)). The defendant challenges the complainant's capacity with respect to an understanding of the duty to tell the truth. Specifically, he contends that the record fails to demonstrate both the complainant's "ability to distinguish the truth from a lie, as well as [her ability] to appreciate her personal obligation to tell the truth."

Implicit in an understanding of the duty to tell the truth is an understanding of the distinction between the truth and a lie. *See State v. Brown*, 138 N.H. 649, 653 (1994) (record supported finding of competency where, *inter alia*, witness "was able to distinguish between the truth and lies"); *State v. St. John*, 120 N.H. 61, 63 (1980) (evidence supported finding that witness understood the duty to tell the truth where, *inter alia*, she "demonstrated that she knew the difference between a lie and the truth"). To determine whether a finding that the complainant possessed such an understanding is sustainable, we examine the record in some depth.

On direct examination of the complainant, the prosecutor inquired:

Q. And now do you know the difference between telling the truth and a lie?

A. Yeah.

Q. And is it — is it good or bad to tell the truth?

A. I'm not sure about that.

Q. Is it good or bad to tell a lie?

A. No, I'm not sure about the lie.

Q. And do you want to tell the truth?

A. Of course.

After the complainant testified that it was very cold out that day, the prosecutor asked, "So if I told you it was hot out today, would that be the truth or would that be a lie?" The complainant responded, "The truth." Similarly, after the complainant testified that she, her mother, and her nurse had been at a prior meeting with the prosecutor, the prosecutor asked, "[I]f I said that [the nurse] wasn't there when we met before, is that the truth or is that a lie?" The complainant answered, "The truth." The prosecutor then asked the complainant why she would want to tell the truth and the complainant stated, "Because I have to get it out."

On *voir dire*, the defense attorney asked her whether it is "okay to sometimes lie?" The following exchange then took place:

A. Oh, well, sometimes to lie.

Q. Can you say that again . . . ?

A. Sometimes is a lie.

Q. When is [it] okay to lie?

A. Well, that's a hard question. I don't know what is a lie, but — I don't know what is a lie. I don't know a lie. I can't remember. I can't remember anything.

Q. So can you think of any examples when it's okay to lie?

A. Yeah.

Q. Can you tell us one of those examples?

A. What's that?

Q. When it's okay to lie?

A. That's a hard question to ask. I don't — I don't know what it is. Oh, man, I can't remember anything of this, oh, God. I can't get it all out. I'm here to tell the truth. I'm here to tell the truth of what happened.

Finally, the trial court questioned the complainant. After asking the complainant to identify what the judge held in his hand, to which she replied, "Pen," the judge asked whether, if he told her what he was holding was a glass, "would I be lying or would I be telling the truth?" The complainant responded, "What do you mean?" The judge again asked whether, if someone told the complainant what the judge was holding was a glass, "would that person be lying or telling the truth?" The complainant answered, "A lie."

The court then asked the complainant to explain in her own words what it meant to tell the truth. In response, she appears to have tried to recount the assault, to which defense counsel objected. The prosecutor urged the court to defer making a competency evaluation, allow the complainant to

testify and evaluate her competency based upon her testimony "throughout . . . the course of the trial." After concluding that it must make a determination of competency before a witness testifies, the court stated that it had one more question for the complainant. The court asked:

> THE COURT: . . . Can you tell me what happens if somebody lies?
>
> A. What do you mean?
>
> THE COURT: Well, that's what I want to know from you. What happens if somebody lies? They don't tell the truth? What do you think happens to people?
>
> A. Oh, boy. They get in trouble when they lie.

The court then ruled that the complainant was competent to testify.

The State asserts that the complainant's answers support the determination of competency. It contends that although she "was unable to define 'truth;' or 'lie,' . . . she was able to tell the court that she wanted to tell the truth, that people got into trouble when they lied, and that it would be a lie to call his pen a glass." The defendant, on the other hand, argues that a single correct answer among a number of incorrect ones cannot establish competency, as a witness giving random answers, would, as a matter of probability, at some point get one answer right. Thus, the defendant asserts:

> [A]s a policy matter, if [the complainant's] testimony suffices to establish competency, Rule 601(b) hardly filters the testimony of any witness. Nearly any witness can fail to answer several basic and highly leading questions about the ability to testify truthfully, as [the complainant] did, eventually can get one answer "right," as [the complainant] did, and be deemed competent, as [the complainant] was.

We agree with the defendant that the complainant's single correct answer, considered together with her prior incorrect ones, does not demonstrate that she understood the difference between the truth and a lie. We cannot agree with the State that "[a]fter confusing *voir dire* from both sides, the trial court was able to cut through the confusion." Rather, the record shows only that the trial court was able to elicit a correct response to the same type of question that both parties had previously posed and to which the complainant had responded incorrectly.

The State cites a number of cases from other jurisdictions for the general proposition that "the failure of a witness to state clearly the difference between a lie and the truth does not render the witness

incompetent to testify." *State v. Pettis*, 488 A.2d 704, 706 (R.I. 1985) (involving testimony by a mentally impaired thirteen year old girl). We do not disagree; nevertheless, as Chief Justice Brock stated in his dissent in *Mills*: "Although the witness need not utter any 'magic words' indicating that he or she understands the difference between the truth and a lie or the importance of telling the truth, some indication of the witness's understanding must be apparent on the record." *Mills*, 136 N.H. at 54 (Brock, C.J., dissenting).

■ We also acknowledge, as the State emphasizes, that the trial court had the opportunity to observe the complainant's demeanor firsthand, while we, in reviewing a competency determination, "must act on a cold record." *Id.* at 50 (quotation omitted). Thus, in general, "[b]ecause so much depends upon his observation of the witness, the trial court's conclusion that [a witness] was competent is entitled to great deference." *Id.* (quotation, citation and brackets omitted). Such deference is not, however, absolute. Rather, "[t]he question is not whether we would have ruled as the trial court did, but *whether there is sufficient evidence in the record to ground the finding." Id.* (emphasis added).

■ The record in this case simply fails to support the trial court's finding of competency. Although the complainant was eventually able to identify an incorrect statement as a lie, that answer must be assessed in context with the complainant's prior faulty attempts to distinguish the truth from a lie and her expressions of confusion over the concepts of truth and falsehood. *Cf. People v. Sutherland*, 743 N.E.2d 1007, 1014 (Ill. App. Ct. 2000) (noting that "one imperfect response to a question is insufficient to invalidate a finding of competency in light of the totality of the responses"), *appeal denied*, 755 N.E.2d 482 (Ill. 2001), *cert. denied*, 534 U.S. 1105 (2002). We conclude that the complainant's testimony, as a whole, fails to demonstrate that she understood the distinction between truth and falsehood, and therefore failed to demonstrate that she understood the duty to tell the truth.

■ The defendant also argues that the State failed to prove that the complainant is mentally defective and that the defendant knew she is mentally defective. "We address this argument because if the evidence was insufficient to support the conviction, the Double Jeopardy Clauses of both the New Hampshire and United States Constitutions would preclude a new trial." *State v. Fuller*, 147 N.H. 210, 213 (2001). In determining whether the evidence was sufficient, however, we consider all the evidence, including the testimony of the complainant that we previously concluded was erroneously admitted; thus, we adopt for purposes of our state constitutional analysis

the United States Supreme Court's standard under the Federal Double Jeopardy Clause. *See Lockhart v. Nelson*, 488 U.S. 33, 34 (1988) (holding that "where the evidence offered by the State and admitted by the trial court — whether erroneously or not — would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial").

■■ "To prevail on his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Littlefield*, 152 N.H. 331, 350 (2005) (quotation omitted). We held in *State v. Frost*, 141 N.H. 493, 497 (1996):

> [A] complainant is "mentally defective" within the meaning of RSA 632-A:2, I(h) only if he or she (1) suffers from a "mental disease or defect" and (2) is incapable of freely arriving at an independent choice whether or not to engage in sexual conduct. The second prong addresses a person's capacity to appraise in a meaningful way the physical nature and consequences of his or her sexual conduct, including its potential to cause pregnancy or disease. The emphasis is on the individual's *capacity* — capacity to learn about physical consequences and to make a decision based on whatever evaluative process the person chooses to employ, as long as the decision is legitimately the person's own.

The defendant likens this case to *State v. Call*, 139 N.H. 102 (1994), in which we found the evidence insufficient to prove beyond a reasonable doubt that the victim was mentally defective. He asserts that, as in *Call*: (1) there was no expert or medical testimony that the complainant is mentally defective within the meaning of the statute; and (2) the complainant's "testimony that she resisted [the defendant's] advances, by telling him to leave her alone and calling out to her mother . . . undercut[s] the State's claim with regard to the 'mentally defective' element."

■ While we took note of the lack of expert or medical testimony "to describe or explain the victim's mental condition" in *Call, id.* at 104, we have never required expert testimony on this issue. Rather, the absence of such evidence in *Call* was just one ground for the conclusion that "[o]n this state of the record alone, nothing indicates that the victim was incapable of legally consenting to the act." *Id.* Here, there was evidence from the complainant's mother that she had been born with disabilities, and that she cannot read. Both the mother and nurse testified as to the complainant's need for assistance with daily activities such as dressing and maintaining

hygiene. Although the mother was not allowed to testify as to the complainant's medical diagnosis, the evidence demonstrated that her disabilities were mental as well as physical: her attendance at the Moore Center, an organization providing services for people with acquired brain disorders and developmental disabilities, as well as her own testimony which, as we concluded above, failed to establish her competency as a witness, all support a finding that the complainant suffers from a mental disorder or defect. *Call*, in which the evidence as to the nature of the victim's disabilities and limitations was apparently less specific, is factually distinguishable. *See id.* (noting that witnesses testified that victim was "handicapped," "looked mentally retarded" and that there was "something mentally wrong" with her).

*Call* is also factually distinguishable on the issue of resistance to the assault. The evidence in *Call* indicated that the victim told the defendant to stop and eventually forced him to stop, demonstrating a clear lack of consent and, by negative inference, possession of the capacity to consent. *Id.* at 103-04. Here, while the complainant testified that she told the defendant "to leave me alone" and tried to call out for her mother, her testimony indicates confusion about the sexual act taking place. She testified that her reaction was, "what are you doing? . . . And I'm like, why are you trying to make me touch it? Why are you doing that?" On this record, we cannot say that "no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State," *Littlefield*, 152 N.H. at 350 (quotation omitted), could have found that the complainant did not have the "capacity to appraise in a meaningful way the physical nature and consequences of . . . sexual conduct." *Frost*, 141 N.H. at 497. Accordingly, we conclude that the evidence was sufficient to show that the complainant was mentally defective within the meaning of the statute.

■ The defendant next contends that even if the State proved the "mentally defective" element, it failed to prove that the defendant knew that the complainant is mentally defective. Generally, a defendant's culpable mental state is proven through circumstantial evidence, *State v. DiNapoli*, 149 N.H. 514, 516 (2003), and, "[w]hen the evidence is solely circumstantial, it must exclude all rational conclusions except guilt." *Littlefield*, 152 N.H. at 350. Nevertheless, in employing this standard, "we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation." *Id.* (quotation omitted).

■ The evidence indicated that the defendant had dated the complainant's mother for nine years, that he was living with them at the time of the

assault and that he would help put the complainant to bed. Thus, we cannot conclude that no rational trier of fact could find that the defendant knew about the complainant's mental and physical limitations. The defendant nevertheless contends that the State "did not prove he knew she was incapable of choosing whether or not to engage in sexual conduct." We disagree. As the State points out, the complainant testified about her confusion at the time of the assault. The State argues that the defendant's "observations of her confusion at the pertinent time and his firsthand awareness of her level of impairment, taken in the light most favorable to the State, lead to only one conclusion: that he knew that [the complainant] was mentally defective within the meaning of the statute." We conclude that the evidence on this point was sufficient.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and CONBOY, JJ., concurred.