Hillsborough-southern judicial district
No. 2012-038

THE STATE OF NEW HAMPSHIRE

v.

HECTOR RODRIGUEZ

Argued: February 7, 2013
Opinion Issued: April 30, 2013

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

█ LYNN, J. Consistent with the law of most jurisdictions, New Hampshire Rule of Evidence 801(d)(2)(E) permits the introduction of coconspirators' statements when made during the course of and in furtherance of a conspiracy. However, post-arrest statements of co-conspirators are *not* admissible under this rule.[1] In this case, a substantial number of post-arrest co-conspirator statements were improperly admitted during the trial of the defendant, Hector Rodriguez, before the Superior Court (*Colburn*, J.) on charges of burglary, conspiracy to commit burglary, first degree assault, accomplice to first degree assault, and conspiracy to commit first degree assault. *See* RSA 626:8 (2007) (accomplice liability); RSA 629:3 (2007) (conspiracy); RSA 631:1 (2007) (first degree assault); RSA 635:1 (2007) (burglary). Following his conviction on all charges, the trial court acknowledged its error and attempted to remedy it by vacating the burglary conviction and one of the first degree assault convictions (the one

---

[1] *See* 29A AM. JUR. 2D *Evidence* § 858, at 149-50 (2008) ("[W]here coconspirators were in custody when they made their confessions, the objects of the conspiracy were complete, and the coconspirators were not attempting to conceal the crime or their cohorts, the statements were not made in furtherance of the conspiracy."); *United States v. Meises*, 645 F.3d 5, 18 n. 21 (1st Cir. 2011) ("There is no question that the hearsay exception for co-conspirator statements made during the course and in furtherance of the conspiracy, does not apply to . . . post-arrest statements." (quotation and citation omitted)).

based on the theory that the defendant acted as a principal in the commission of the assault), while allowing the remaining three convictions to stand. Because we conclude that the improperly admitted evidence constitutes harmless error with respect only to the defendant's conviction for conspiracy to commit burglary, we affirm that conviction, but reverse his convictions on the accomplice and conspiracy first degree assault charges and remand for a new trial on those charges.

I

The following facts were adduced at trial. In the interests of clarity and to underscore the integral role that the improperly admitted statements played in the State's case, we recite those statements in italics, while detailing the properly admitted evidence in standard font. In 2010, the defendant and Jesus "Stretch" Cortes were incarcerated together at the Youth Detention Center (YDC) in Manchester. A YDC employee testified that Cortes and the defendant "did not get along very well" and that an incident occurred when Cortes assaulted the defendant and gave him a black eye. *The employee heard the defendant say that he and Cortes "were going to have some type of retaliation" and that "some people that he was friends with, possibly his brother, was going to help him."* The YDC employee characterized the defendant's statements as "just talking" and "embellish[ing]." Nashua Police Detective Daniel Mederos, who interviewed the defendant, testified that the defendant told him that "he's had past issues with Jesus Stretch Corte[s]."

On January 2, 2011, the defendant was at his home in Nashua with his brother, Anthony Serrano, as well as Junior Vincente and Adam "Bori" Santiago. That same evening Nicholas Voight and Nicole Iannelli were at Iannelli's house. Iannelli testified that Voight called the defendant and then asked Iannelli to drive him to the defendant's house. She agreed and they left at around 7 p.m.

According to Iannelli, at the defendant's house, she and Voight encountered the defendant, Serrano, Vincente, and Santiago, none of whom Iannelli had met before. The men were standing outside, wearing oversized sweatshirts and baggy pants. They were speaking Spanish, which Iannelli could not understand, and she heard the name "Stretch" mentioned in passing. Iannelli generally described the men as "talking, and making weird gestures, like moving, getting kind of hyperactive and moving around, and like lifting their shirts . . . [and] going about themselves." She did not see any weapons. Iannelli heard the defendant and Voight engage in small talk in English. The defendant appeared to her to be "the leader," "the big man on campus . . . leading everybody."

Detective Alex Gorman interviewed Voight. *He testified that Voight told him that he knew where Cortes lived and told the defendant. Voight told Gorman that he "had a double beef with Stretch" for a prior assault and for "shorting his bags of marijuana."* Detective Mederos interviewed Vincente. *He testified that, according to Vincente, "the plan was to go to [Cortes'] house because [Voight] knew him from buying weed" and "gave the information about where Stretch lived."* Mederos also testified that the defendant admitted to him that "he was with a group," that "they planned to go and assault Stretch," and that "they basically came up and intended to go over to Jesus Corte[s'] residence to assault him."

*Detective Gorman testified that Santiago told him that the plan was to beat up Cortes and not to "stab him or kill him." Nevertheless, Santiago told Gorman that he brought a knife, a "mini-Samurai sword, eight inches total in length, with probably a . . . four-inch blade," and showed it to everyone. On cross-examination, Gorman clarified Santiago's account of showing the knife to the others:*

> [H]e does say that he shows it. Obviously the transcript doesn't show the motions that he was making. When he says, "I got it right here," he was, in the interview, lifting up his shirt and pointing to his waistband saying that he didn't take — and when I said, "Did you take it out, you know, and [wave] it around," he said, "No, I had it right here."

Iannelli testified that at the defendant's house, the defendant asked her if she had her driver's license, whether she was driving her own car, and how long she had been driving. He then asked her to drive him "somewhere," but he did not say where. According to Iannelli, the defendant's tone was such that she did not feel she had the choice of refusing him. The defendant got into Iannelli's car, while Serrano, Vincente, Santiago, and Voight got into a silver Lincoln that belonged to the defendant's mother. Iannelli said that she did not have any weapons in her car and did not look inside the Lincoln to see if it contained weapons. The defendant instructed Iannelli to follow the Lincoln but did not tell her where they were going.

*Detective Gorman testified that, according to Voight, once he was in the car with Serrano, Santiago, and Vincente, he explained "where specifically in the building that Voight was bringing them to . . . [that] Stretch lived." "He said that you go in the main door, go up the stairs, take a left and it's the first door on your right. And he also gave them an apartment number . . . 206." Voight told Gorman that he did not see any weapons and "knew that they were going to beat up Stretch and possibly take his . . . drugs." Santiago told Gorman that Serrano brought "a miniature baseball*

*bat, almost like a souvenir baseball bat" made of wood. Gorman, who also interviewed Serrano, testified that Serrano confirmed the men brought weapons with them in the Lincoln.*

Iannelli testified that she followed the Lincoln to the parking lot of an apartment building on Ledge Street in Nashua. Voight pulled into the parking lot and parked facing away from the building; Iannelli parked next to him, facing the building. The defendant got out of Iannelli's car and Santiago, Serrano, and Vincente got out of the Lincoln. The defendant instructed Iannelli to stay in the car, and she and Voight remained in their respective cars while the defendant, Santiago, Serrano, and Vincente went into the building. Iannelli did not see them wearing masks or carrying weapons. She observed that the men were talking, but did not hear what they were saying because the windows of her car were rolled up.

Detective Mederos testified that the defendant described to him what happened next. The defendant, Serrano, Santiago, and Vincente entered the building, which "was identified as Corte[s'] residence," through its front entrance. The men "put black things over their faces, and they all went up to the second floor of the apartment building, where [the defendant] remained near the fire door outside the apartment." The defendant told Mederos "that he went there as extra muscle and that he stayed by the fire door as Anthony Serrano, Junior Vincente and Bori [Santiago] went to the front door of apartment 206," where the defendant believed Stretch lived. Based upon photographs introduced at trial, Mederos testified that the fire door was approximately twenty feet from the door to apartment 206 and, standing beside the fire door, "[y]ou can see the entire . . . hallway outside . . . [and] the entire front door" of apartment 206.

According to Detective Mederos, the defendant told him that "someone knocked on the door, and an individual opened the door, and [the defendant] observed [Serrano] strike . . . the individual who answered the door with a bat." The defendant described Serrano's bat as "a small, wooden . . . T-ball bat." The defendant saw Santiago "with his right hand stretched out in . . . front of him enter the apartment"; Serrano and Vincente followed Santiago into the apartment. The defendant "couldn't see anything from the hallway of what was going on inside" other than "that it was a male that came to the door." According to Mederos, the man who opened the door turned out to have been Maxene Rousseau, who "[was] clearly not the same build or [had] the same physical characteristics as Jesus Corte[s]," such that the two men "are dissimilar enough that there wouldn't be [a mistake]."

*Detective Mederos further testified that Vincente told him that it was he, Vincente, who "was in the hallway looking out" and that it was the defendant who entered the apartment with Santiago and Serrano. Serrano first hit with a bat the man who opened the door, then Santiago rushed in*

*with a knife, followed by Serrano and the defendant. A short while later, Vincente opened the door to apartment 206, said "Let's go," and the men fled the building.*

*Mederos testified that Serrano told him that both the defendant and Vincente went into apartment 206 together with himself and Santiago; Serrano did not specify where inside the apartment the defendant went. On cross-examination, however, Mederos testified that, during his interview, Serrano also told him that neither he nor the defendant went inside the apartment.*

*Detective Gorman testified about Santiago's differing versions of what transpired inside the apartment building. Santiago told Gorman that Serrano first hit with the bat the man who opened the door, then Santiago stabbed the man, and then Vincente followed them into the apartment. Santiago also told Gorman that Vincente did not go into the apartment and stood outside as the lookout. At some point, Santiago said that he served as the lookout and did not go inside the apartment. Finally, Santiago told Gorman that Vincente and Serrano went in first, and "then they came back and brought [Santiago] over later." Santiago said that all of them "were wearing masks . . . or had some sort of face covering."*

Rousseau testified about what happened when he opened the door. He was first hit on the forehead with a baseball bat and then stumbled back as he was hit, kicked, and punched repeatedly. Someone attempted to stab him, but he kept blocking the attempts. Rousseau's vision was blurry and "bloody" and he could not describe how many assailants he saw:

> When I was on the ground there was a gentleman in front of me with a mask, and I could look there's a tall gentleman and now the gentleman kept pacing. But I cannot give any description because . . . it was so blurry. There's not much I could see . . . the only way I know, there was a chubby guy in front of me, because he pretty much, right on my face, ask me for somebody that they know. They said, "Are you so and so?"

Rousseau responded that he was not "so and so" and asked, "What did I do to you guys? I do not know you guys." The "chubby guy" bent down and pulled off a black-and-white mask. The men asked Rousseau whether he lived in the apartment. Rousseau said yes, at which point "the chubby guy turn[ed] around, talk[ed] to his friend," swore, and then the men ran out of the apartment. The assault lasted approximately five minutes.

Although Rousseau testified on direct examination about a "tall guy," a "chubby guy," a masked man, and "another gentleman pacing," he appeared unclear as to how many assailants he saw or what they looked like.

Q: . . . Was the person who was wearing the mask, did he enter your apartment?

A: Yes.

Q: Okay. What about the tall guy?

A: Yes.

Q: And what about the chubby guy?

A: No, the chubby guy looked like it was in front of me, and the tall guy — it was another gentleman pacing. I can tell how big it was because I cannot give no description with everything that was going on and blurriness. I can tell no description. All I could see was, there was a gentleman with the mask, that's why it's chubby, in front of me. . . . I asked him the question.

Q: Okay. . . . [W]hat about the guy who was pacing, where was he?

A: He was in . . . the kitchen, but it was like behind the tall guy.

On cross-examination, Rousseau clarified that he described one of the assailants as tall because he was taller than the "chubby guy," and that he described the "chubby guy" as chubby because he was so close to Rousseau's face when he bent down to ask Rousseau a question; he could not describe "this chubby guy" any further. Also on cross-examination, Rousseau indicated that there were three assailants, although he could not describe them.

After the men left the apartment, Rousseau stood up, walked down the hallway, pulled the fire alarm, walked downstairs and out the front door where a "car reversed and hit [him]." He heard a male voice say "Go, go, go" from inside the car and, as his "body lay on the trunk and the back window," he "hit the car real hard . . . kind of smash[ing] the back window." He saw that a white girl with black hair was driving the car.

Iannelli testified that five minutes after they walked in, the four men ran out of the building. The defendant got into her car while the other three got into the Lincoln where Voight was waiting. The defendant instructed Iannelli to drive, yelling "Go, go, go." Voight backed out of the parking lot, hitting a car on his way out. Then Iannelli "backed up and felt something, and [her rear] windshield smashed, and then somebody was on top of [her] car." She turned around and saw a tall black male who "jumped on [her] car and was trying to get in, like come after them." The defendant kept "saying to go and to leave" and Iannelli pulled out and left the parking lot. The

defendant appeared nervous and instructed Iannelli "to just go straight because it was quicker." She "asked him what happened and where [they] were going. He told [her] not to ask questions and to keep going, and just kept repeating himself."

Back at the defendant's house, Iannelli initially stayed in the car, but the defendant got out and told her to get out of the car. The others were already there, engaged in conversation. Iannelli did not see any weapons. She heard the defendant "describe[] which apartment building they went to, and then [Voight] said that, 'It was the wrong guy. It was the wrong one. I said to go to the left. You went to the right,' or something like that." On cross-examination, Iannelli clarified that she did not remember who said, "We got the wrong guy." The men were acting "[v]ery nervous and scared." Approximately five minutes later, she and Voight went back to Iannelli's house, and Voight was "freaking out and screaming and yelling."

The next day, Iannelli learned what had happened through news accounts. Her father took her to the Nashua Police Department, where she spoke with Gorman, identified the defendant from a photographic array, and helped locate Voight. In the course of the ensuing investigation, police interviewed the defendant, Voight, Serrano, Vincente, and Santiago. They also spoke with Rousseau. A search of the silver Lincoln produced "a pair of black leggings that were consistent with some of the descriptions . . . of one of the face coverings [used during the attack], as well as a wooden stick or shovel handle, ax handle in the trunk." The police did not test the stick for fingerprints because, according to Gorman, "it generally didn't match the description of the weapon that was described . . . by everybody." Nor did they test the leggings for DNA. The police did not collect any fingerprints or other forensic evidence, such as DNA, from the apartment.

During the trial, the defendant repeatedly and unsuccessfully objected to the admission of Detective Gorman's and Detective Mederos' testimony concerning what they were told by Voight, Serrano, Vincente, and Santiago. When the State proposed to "elicit statements in furtherance of th[e] conspiracy from the co-conspirator [Vincente] through Detective Mederos," the defendant objected, arguing that the State had failed to establish by a preponderance of the evidence the existence of a conspiracy and that admission of these statements would violate his rights under the Confrontation Clause. The court overruled the objection. When Mederos testified about what Vincente said he heard from Voight, the defense objected on the grounds that such statements constituted double hearsay. The court agreed, but allowed the State to proceed "consistent with [its] ruling." The State proceeded to question Mederos about what Vincente told

him Voight had told Vincente. When Mederos began to testify about his interview with Serrano, the defense renewed its objection and the court adhered to its previous ruling.

Before defense counsel began cross-examining Mederos, the court reaffirmed its ruling on the defendant's objections. The trial judge stated that in so ruling, she "was focused on the rules of evidence," specifically New Hampshire Rule of Evidence 801(d)(2)(E), and, having further researched the defendant's arguments under the Confrontation Clause, affirmed the ruling. The defendant argued that he needed to cross-examine the co-conspirators because they gave vastly inconsistent accounts of what had transpired. The State responded that the defendant would be able to cross-examine the detectives and "inquire of other statements that may be inconsistent with those statements that are elicited as being in furtherance of the conspiracy." The State asked that the court rule on the admissibility of the co-conspirators' statements on a question-by-question basis, and the court agreed. Before Gorman began to testify about Voight's and Santiago's post-arrest statements, the defendant renewed his objection and the court again reaffirmed its ruling.

Prior to submitting the case to the jury, the court gave the following instruction:

> You've heard testimony relative to statements made by Anthony Serrano, Junior Vincente, Adam Santiago and Nicholas Voight, all of whom are alleged co-conspirators and unavailable witnesses at trial. There can be many reasons why a person is unavailable, and you are not to speculate as to why they did not testify at this trial. . . .

> You should note that because these alleged co-conspirators did not testify, [the defendant] did not have an opportunity to question them or challenge their statements directly. You can reject their statements, you can accept the statements as true, or you can accept some and reject some of these statements as true. In short, you should give them as much weight as you think they deserve.

During deliberations, the jury asked to "hear/see detective Mederos or detective Gorman testimony regarding his interview with Anthony Serrano and Junior Vincente." The court responded that no transcript was available and instructed the jurors to rely upon their collective memories. The jury convicted the defendant of all five charges.

The defendant moved to set aside the verdicts, arguing that the co-conspirators' post-arrest statements were improperly admitted because

they were made neither during the pendency of nor in furtherance of the conspiracy. At a hearing on the motion, the court ruled that "the co-conspirators' statements . . . should not have been allowed . . . in the way they came in," and given this error, "the question becomes, is it harmless error because is there enough . . . evidence on the balance to sustain the convictions." The court found that the remaining admissible evidence was not sufficient to support the convictions for burglary and for the first degree assault charge predicated on the defendant's participation as a principal in that offense. As to the convictions for the three remaining charges, the court ruled:

> [U]ltimately, particularly . . . in the context of a motion to vacate . . . and after the fact, negating of a charge, . . . the Defense in this case certainly met their burden of establishing that there might have been error. And then the analysis just becomes how harmless it is. And I think there was plenty of other testimony to support the conviction, which is why I'm not going to grant it on all the other charges.

The court subsequently issued a written order setting aside the convictions for burglary and first degree assault based upon the principal liability theory, and upholding the convictions for conspiracy to commit burglary, conspiracy to commit first degree assault, and first degree assault based upon accomplice liability. The court determined that the admission of the co-conspirators' statements was contrary to New Hampshire Rule of Evidence 801 because they were not made during the pendency of and in furtherance of the conspiracy, and contrary to the Confrontation Clause because the statements were testimonial. *See Crawford v. Washington*, 541 U.S. 36 (2004); U.S. CONST. amend. VI. The court proceeded to apply the standard of review applicable to motions to set aside a verdict, whereby "the defendant has the burden of establishing that the evidence, viewed in its entirety and with all reasonable inferences drawn in favor of the State, was insufficient to prove beyond a reasonable doubt that he was guilty of the crime charged." *State v. Fandozzi*, 159 N.H. 773, 782 (2010) (quotation omitted). Applying this standard, the court concluded that: (1) "the balance of the evidence, absent the co-conspirator statements, is sufficient to find the defendant guilty of conspiracy to commit burglary"; (2) "with all reasonable inferences drawn in favor of the State, [the evidence] is sufficient to sustain a guilty verdict as to the charge of conspiracy to commit first degree assault"; and (3) "there is sufficient evidence that the defendant acted in concert with the others to commit first degree assault." This appeal followed.

## II

On appeal, the defendant argues that the trial court applied the wrong standard of review when ruling on his motion to set aside the verdicts. The trial court reviewed the convictions under the standard applicable to motions to set aside a verdict; it placed the burden on the defendant to establish that the entirety of the properly admitted evidence, with all reasonable inferences drawn in favor of the State, was insufficient to prove beyond a reasonable doubt that the defendant was guilty. *See id.* The defendant argues that the court should have applied the harmless error test, which puts the burden on the State to demonstrate, beyond a reasonable doubt, that the erroneously admitted evidence did not affect the verdict. *See State v. Beede,* 156 N.H. 102, 109 (2007). The State responds that the defendant failed to preserve this argument because he did not file a motion to reconsider asking the court to apply the correct legal standard, *see New Hampshire Department of Corrections v. Butland,* 147 N.H. 676 (2002), or make a specific contemporaneous objection during the hearing on the motion to set aside the verdicts, *see State v. Ericson,* 159 N.H. 379, 386 (2009); SUPER. CT. R. 59-A.

The defendant also appeals the trial court's improper admission of the post-arrest co-conspirator statements and argues that this error requires the reversal of all of his convictions. The State has not cross-appealed the trial court's ruling that it erred in the admission of these statements, nor the action taken by the court — dismissal of the burglary and first degree assault-principal liability charges — to remedy its error.[2] Furthermore, the State does not argue that the defendant failed to preserve his argument that the improper admission of the statements requires reversal of his convictions.

█ Accordingly, we do not need to address whether the defendant preserved his challenge to the standard of review that the trial court applied to his post-trial motion. Instead, we proceed directly to the question of whether the admission of Detective Gorman's and Detective Mederos' testimony concerning what they were told by Voight, Serrano, Vincente, and Santiago amounted to harmless error.

> An error is harmless if we can say beyond a reasonable doubt that it did not affect the verdict. The State bears the burden of proving that an error is harmless. The evaluation of whether the State has

---

[2] *But see Lockhart v. Nelson,* 488 U.S. 33, 34 (1988) (holding that "where the evidence offered by the State and admitted by the trial court — whether erroneously or not — would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial"); *State v. Horak,* 159 N.H. 576, 582-83 (2010) (adopting *Lockhart's* holding for purposes of double jeopardy analysis under the New Hampshire Constitution).

met its burden involves consideration of the alternative evidence presented at trial and the character of the contested evidence. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight, and if the contested evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. In making this determination, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence itself.

*Beede*, 156 N.H. at 109 (citations omitted).

As to the convictions for accomplice to first degree assault and conspiracy to commit first degree assault, we cannot conclude that the erroneous admission of Voight's, Vincente's, Serrano's, and Santiago's post-arrest statements through the testimony of Detectives Mederos and Gorman was harmless beyond a reasonable doubt.

The indictment for accomplice to first degree assault alleges that the defendant,

> while acting in concert with Anthony Serrano, Junior Vincente and Adam Santiago, knowingly caused bodily injury to M.R. by striking M.R. in the head with a bat, stabbing him twice with a knife and kicking him while he was on the ground; said bat and knife being deadly weapons as then and there used . . . .

A person acts as an accomplice if, "[w]ith the purpose of promoting or facilitating the commission of the offense, he solicits such other person in committing it, or aids or agrees or attempts to aid such other person in planning or committing it." RSA 626:8, III(a). Here, the defendant is alleged to have facilitated the commission of first degree assault by "knowingly caus[ing] bodily injury to another by means of a deadly weapon." RSA 631:1, I(b).

As to the defendant's conviction for conspiracy to commit first degree assault, a conviction for criminal conspiracy requires the State to prove that the defendant, "with a purpose that a crime defined by statute be committed, . . . agree[d] with one or more persons to commit or cause the commission of such crime, and an overt act [wa]s committed by one of the conspirators in furtherance of the conspiracy." RSA 629:3, I. The indictment for conspiracy to commit first degree assault alleges that the defendant,

> with the purpose to commit the crime of First Degree Assault, did agree with Nicholas Voight, Junior Vincente, Anthony Serrano and

> Adam Santiago to go to the residence of Jesus Cortes . . . to cause bodily injury to him through the use of a bat and a knife, said bat and knife being deadly weapons in the manner they were intended to be used . . . .

The underlying offense which the defendant allegedly conspired to commit was first degree assault, an element of which, as charged, is the use of a deadly weapon. *See* RSA 631:1, I(b).

To find a defendant guilty of criminal conspiracy, the jury must find that he agreed — even tacitly, *State v. Gilbert*, 115 N.H. 665, 667 (1975) — to bring about each element of the underlying offense. *See State v. Douglas*, 11 A.3d 699, 707 (Conn. App. Ct. 2011) ("[P]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (quotation and brackets omitted)). This is the reason that "[a] jury in a conspiracy prosecution must be instructed on all of the essential elements of the crime that a defendant is alleged to have conspired to commit . . . ." 15A C.J.S. *Conspiracy* § 223, at 511 (2012); *United States v. McCaleb*, 552 F.3d 1053, 1058 (9th Cir. 2009) ("[A] district court plainly errs in a conspiracy case if it fails to instruct the jury on an element of the crime that is the object of the conspiracy." (quotation omitted)).

> An agreement is insufficient to establish conspiracy with others that certain activities be done . . . *without [the defendant] knowing that the goal of the conspiracy was to commit the specific crime charged* as the basis of the conspiracy.
>
> A conspiracy is not established by a showing of mere knowledge of the acts of the other parties, acquiescence in their purposes, or mere passive cognizance of the crime. Mere presence or awareness is insufficient. There must be some knowing participation in the conspiracy with a view to the furtherance of the common design and purpose.

15A C.J.S. *Conspiracy, supra* § 122, at 449-50 (emphasis added).

Thus, to affirm the defendant's convictions for conspiracy to commit first degree assault and accomplice to first degree assault, we must be able to conclude that the properly-admitted evidence overwhelmingly established that he had at least a tacit understanding that deadly weapons would be used in the commission of the assault. *See Beede*, 156 N.H. at 109. The State asserts that this standard is met, arguing:

> Given the swiftness of the attack with deadly weapons and the entry into the apartment, common sense dictates that the group

had planned to attack Cortes with deadly weapons, that they had planned to enter the apartment during the attack, and that the others had their weapons out and ready before Rousseau answered the door.

We are not convinced. In his interview with Mederos, the defendant acknowledged the planned assault on Cortes but did not say that weapons would be used in the attack. Iannelli testified that she saw the men lift their shirts, but she did not see any weapons. Santiago's improperly-admitted statement that he showed the knife to everyone constituted the only direct evidence that the defendant knew that one of the co-conspirators was armed. There is no evidence that the defendant knew Serrano was armed with a bat, other than the inference that he must have seen Serrano holding it at some point on his way into and/or once inside the building; yet Iannelli testified that she did not see any weapons when the men went into the building.

Even though a jury *could* reasonably have found that the defendant must have seen Santiago bare the knife before one of the men knocked on the door, and therefore concluded — based upon the absence of evidence of the defendant's objection or attempted withdrawal from the venture at that point — that he assented to the use of this weapon, the strength of this inferential chain is not compelling in light of the record as a whole. Mederos testified that the fire door was approximately twenty feet from the door to apartment 206, and absent Santiago's improperly admitted description of the knife as being eight inches long, there was no other evidence concerning the size of the knife — and therefore the obviousness of its visibility.[3] The defendant told Mederos merely that he saw Santiago, with his right hand extended, enter the apartment.

As to the bat, although a jury *could* reasonably have found that the defendant saw Serrano with the bat before Rousseau opened the door, the properly-admitted evidence that he knew a bat would be used in the commission of the offense is not overwhelming. As with the knife, the size and appearance of the bat are far from obvious. Although Mederos testified that the defendant described "the bat that his brother Anthony Serrano had . . . as a small wooden . . . T-ball bat," the detective did not indicate that the defendant acknowledged seeing Serrano with the bat before he actually used it to hit Rousseau. The police ultimately retrieved from the Lincoln

---

[3] The trial court found — and the State does not contest — that the evidence placing the defendant inside the apartment (and therefore rendering him part of the physical attack on Rousseau) came entirely from post-arrest co-conspirator statements. To determine whether the erroneous admission of these statements was harmless error, we must therefore consider the only alternative evidence of the defendant's location within the building: his statement to Mederos that he remained by the fire door and acted as a lookout.

what Gorman described as "a wooden stick or shovel handle, ax handle," which was so dissimilar to "the weapon that was described . . . by everybody" that the police did not test it for fingerprints. Additionally, Iannelli testified that the men were wearing oversized sweatshirts and baggy pants, clothing under which one could conceal either a knife or a small bat.

Moreover, the improperly admitted statements of the co-conspirators placed the defendant inside the apartment participating in the physical attack on Rousseau — a scenario under which the inference that deadly weapons were used with the defendant's knowledge and consent was far stronger than without such evidence.

 In sum, even taking account of the evidence suggesting that the defendant may have been the leader of the criminal venture, we conclude that the admissible evidence of the defendant's guilt of accomplice to first degree assault and conspiracy to commit first degree assault "is [not] of an overwhelming nature, quantity or weight, and . . . the contested evidence is [not] merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." *Id.* Having determined that the error was not harmless, we reverse these convictions and remand. *See State v. Reid*, 134 N.H. 418, 423 (1991); *State v. Leuthner*, 124 N.H. 638, 642 (1984).

Finally, addressing the defendant's conviction for conspiracy to commit burglary, we find that the admission of the post-arrest co-conspirator statements was harmless error. Under RSA 635:1, I, "A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied section thereof, with purpose to commit a crime therein . . . ." *See also* RSA 629:3, I.

 The defendant argues that the admissible evidence of an agreement to enter the apartment with the purpose to commit a crime inside is not overwhelming. We disagree. A YDC employee testified that the defendant said he would enlist his friends, and perhaps his brother, to help him retaliate against Cortes. Iannelli testified that, on the night of the assault, the men mentioned the name "Stretch" and the defendant appeared to be the leader of the group. She further testified that the defendant persuaded her to drive him and instructed her to follow Voight and the others. According to Mederos, the defendant said he entered the apartment building because "[i]t was identified as Corte[s'] residence." Most importantly, Mederos testified that the defendant admitted to him that, on the night of January 2, 2011, "he was with a group and they basically came up and intended to go over to Jesus Corte[s'] residence to assault him." In addition, the defendant's statements as to his actions as the "lookout," combined with Rousseau's testimony that his attackers hit him and entered

the apartment immediately upon his opening the door, plainly show that the criminal venture that he joined contemplated entry into the apartment to carry out the attack. Given the defendant's admission that he intended to go to Cortes' residence to assault him as well as evidence that he enlisted the help of others to do so, we conclude that the alternative evidence of the defendant's guilt is overwhelming, *Beede*, 156 N.H. at 109, and affirm the defendant's conviction for conspiracy to commit burglary.

We deem waived the remaining questions that the defendant raised in his notice of appeal but did not brief. *State v. Kelley*, 159 N.H. 449, 455 (2009).

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and HICKS, CONBOY and BASSETT, JJ., concurred.