******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TERRELL
WILLIAMS POND
(SC 19074)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued February 10, 2014—officially released February 10, 2015*

*Leonard C. Boyle*, deputy chief state's attorney, with
whom, on the brief, were *Michael Dearington*, state's
attorney, and *John C. Lion*, senior assistant state's
attorney, for the appellant (state).

*Kevin Munn*, certified legal intern, with whom were
*Timothy H. Everett*, assigned counsel, and, on the brief,
*Bryce Petruccelli*, certified legal intern, for the appel-
lee (defendant).

*Opinion*

PALMER, J. General Statutes § 53a-48 (a), Connecticut's criminal conspiracy statute, provides that "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."[1] The dispositive issue presented by this certified appeal is whether, to be convicted of conspiracy, a defendant must specifically intend that every element of the planned offense be accomplished, even an element that itself carries no specific intent requirement. Because we are not persuaded that the legislature intended to punish offenders for conspiring to commit crimes that they never agreed or intended to commit, we conclude that § 53a-48 (a) does impose such a requirement.

The charges in this case arose from an incident in which the defendant, Terrell Williams Pond, and his friend, Montel Harris, allegedly approached the victim, Stanislaw Grzadko, on a public street, and Harris displayed a carbon dioxide ($CO_2$) pistol (air pistol) while demanding that Grzadko surrender the contents of his pockets. A jury found the defendant not guilty of attempt to commit robbery in the second degree but found him guilty of conspiracy to commit robbery in the second degree in violation of General Statutes (Rev. to 2007) § 53a-135 (a) (2)[2] and § 53a-48 (a). The trial court rendered judgment in accordance with the jury's verdict,[3] and the defendant appealed to the Appellate Court, claiming, among other things, that the trial court improperly had failed to instruct the jury that, to find the defendant guilty of the conspiracy charge, it must find that he had specifically intended that the planned robbery would involve the display or threatened use of what Harris represented to be a deadly weapon or dangerous instrument.[4] The Appellate Court agreed with the defendant, reversed the judgment of the trial court, and remanded the case for a new trial. *State* v. *Pond*, 138 Conn. App. 228, 238–39, 50 A.3d 950 (2012). We granted the state's petition for certification to appeal, limited to the following question: "Did the Appellate Court properly determine that in order to [establish that] a defendant [is guilty] of conspiracy to commit robbery in the second degree in violation of . . . §§ 53a-48 (a) and 53a-135 (a) (2), the state must prove that the defendant conspirator had the specific intent that there would be a display or threat of the use of what was represented to be a deadly weapon or dangerous instrument, even if that specific intent is not required for proof of [that element of] the underlying crime of robbery in the second degree?" *State* v. *Pond*, 307 Conn. 933, 56 A.3d 714 (2012).[5] We answer the certified question in the affirmative and, accordingly, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court, as supplemented by the record, sets forth the following facts that the jury reasonably could have found. "On October 27, 2008, [Grzadko] . . . ate dinner and then went for his evening walk. . . . [W]hile he was walking on the Dixwell Avenue sidewalk [in the town of Hamden], he was approached from behind by the defendant and . . . Harris, both of whom were riding bicycles on the sidewalk. Harris approached [Grzadko] on his left, the defendant approached on his right . . . . Harris asked [Grzadko] where he was going and then demanded that he stop, repeating the order 'two [or] three times . . . .' When [Grzadko] continued to walk, the defendant pushed his bicycle in front of [him], forcing him to stop. With [Grzadko] now unable to move forward, Harris raised his jacket and lifted the handle of what appeared to be a gun, [which] later [was] determined to be [an air] pistol, from his waistband, asking [Grzadko], 'do you know what it is?' When [Grzadko] responded, 'yes, yes, I know,' and as the defendant continued to block [Grzadko] from moving, Harris ordered [Grzadko] to remove everything from his pockets. Rather than turn his belongings over to the two young men, [Grzadko] turned to the side and ran into traffic on Dixwell Avenue in order to escape. The defendant and Harris rode off on their bicycles. Shortly thereafter, [Grzadko] called the Hamden police and reported the incident. Later that evening, the Hamden police detained the defendant and Harris, and [Grzadko] later identified them as the two young men who had accosted him." *State* v. *Pond*, supra, 138 Conn. App. 231–32.

The defendant was charged with attempt to commit robbery in the second degree and conspiracy to commit robbery in the second degree. The case was tried to a jury, and the defendant testified in his own defense. In addition to denying that he was one of the perpetrators of the alleged holdup, the defendant specifically denied that he was aware that Harris was carrying an air pistol on the evening in question. The only evidence that the state proffered with regard to the alleged conspiracy was Grzadko's testimony describing the few minutes during which the attempted robbery occurred. Nevertheless, the jury returned a verdict of guilty on the conspiracy count and not guilty on the attempt count.

The opinion of the Appellate Court sets forth the following additional facts concerning the trial court's jury instructions. "After reading the conspiracy statute to the jury, giving general instructions on what was and was not required to prove an agreement and instructing on the necessity of an overt act, the court stated: 'The third element is that the defendant had the intent to commit robbery in the second degree. The intent for that crime is that at the time of the agreement he intended to commit larceny. The defendant may not be found guilty unless the state has proved beyond a

reasonable doubt that he specifically intended to commit a larceny when he entered into the agreement. In summary, the state must prove beyond a reasonable doubt that the defendant had an agreement with one or more other persons to commit robbery in the second degree, at least one of the coconspirators did an overt act in furtherance of the conspiracy, and the defendant specifically intended to deprive the owner of his property.' "[6] Id., 237–38.

On appeal to the Appellate Court, the defendant claimed, among other things, that the trial court improperly had failed to instruct the jury that, to be guilty of conspiracy to commit robbery in the second degree under §§ 53a-135 (a) (2) and 53a-48 (a), the defendant must have specifically intended that his coconspirator would display or threaten the use of what the coconspirator would represent to be a deadly weapon or dangerous instrument.[7] Id., 231, 236. In addressing the defendant's claim, the Appellate Court relied on this court's decision in *State* v. *Padua*, 273 Conn. 138, 869 A.2d 192 (2005), for its conclusion that § 53a-48 (a) "requires specific intent to bring about *all* of the elements of the conspired offense, even those that do not by themselves carry a specific intent [requirement]." (Emphasis in original.) *State* v. *Pond*, supra, 138 Conn. App. 234. The Appellate Court interpreted *Padua* to mean that, "in order to prove [that] the defendant [is] guilty of conspiracy to commit robbery in the second degree in violation of [§§] 53a-135 (a) (2) [and 53a-48 (a)], the state needed to prove that he and his coconspirator specifically had an agreement to display a deadly weapon or dangerous instrument and that the defendant had the specific intent that such a weapon or instrument would be displayed." Id. Concluding that the trial court's failure to instruct the jury in accordance with this principle as to an essential element of the charged crime was not harmless; id., 239; the Appellate Court reversed the judgment of the trial court and remanded the case for a new trial. Id.

Judge Borden issued a separate concurrence in which he agreed with the Appellate Court majority that that court was bound by *Padua* to conclude that the trial court's instructions to the jury were deficient. Id. (*Borden, J.*, concurring). Judge Borden also opined, however, that imposing a higher mens rea requirement for conspiracy than that required to commit the underlying or object offense created an unwarranted anomaly in the Penal Code, and he therefore invited this court to reconsider the interpretation of § 53a-48 (a) that we adopted in *Padua*. See id., 239, 251 (*Borden, J.*, concurring).

On appeal to this court following our granting of certification, the state contends that the language in *Padua* on which both the Appellate Court majority and Judge Borden relied was dictum and does not control

the present case. In the alternative, the state urges us to accept Judge Borden's invitation to reexamine the interpretation of § 53a-48 (a) that we adopted in *Padua* and to hold that one need not specifically intend every element of robbery in the second degree in order to be guilty of conspiracy to commit that offense. For the reasons set forth hereinafter, we agree with the Appellate Court that *Padua* controls the outcome of this case and that an essential element of conspiracy to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a) is that the defendant have the specific intent, as part of the unlawful agreement, that, during the plotted robbery or the immediate flight therefrom, a coconspirator will display or threaten the use of an object that the coconspirator represents to be a deadly weapon or dangerous instrument.

I

We first consider whether the Appellate Court properly concluded that our decision in *Padua* controls the outcome of the present case. We agree that it does.

In *Padua*, the defendants were all members of an extended family that, for months, had been conducting a lucrative drug trafficking operation out of their apartment in a public housing project; see *State* v. *Padua*, supra, 273 Conn. 143–44, 158; an operation that this court characterized as "part of the daily life of the household." Id., 158. The defendants were convicted of, among other things, conspiracy to sell marijuana within 1500 feet of a public housing project. Id., 142. At the time, it was settled law that the accused need not know that the place of sale is within a protected zone to be guilty of the underlying drug crime. See *State* v. *Denby*, 235 Conn. 477, 482, 668 A.2d 682 (1995) (state need not prove that defendant knew that location of narcotics sale was within 1000 feet of school to secure conviction under General Statutes [Rev. to 1991] § 21a-278a [b]).

On appeal, the Appellate Court reversed the conspiracy convictions, concluding that the trial court improperly had instructed the jury that an essential element of the charged crime was that the conspiracy must have been *formed* within 1500 feet of a public housing project, rather than that the *object* of the conspiracy must have been to sell drugs from such a location. *State* v. *Padua*, supra, 273 Conn. 145, 165. On appeal to this court, the state conceded that the instruction was incorrect but argued that the impropriety was harmless beyond a reasonable doubt because abundant evidence in the record, together with the conviction of the defendants on related drug charges, left no doubt that the defendants had in fact knowingly conspired to sell marijuana from their public housing project apartment. Id., 165–66. We agreed and reversed the judgment of the Appellate Court. Id., 166, 171, 187.

In construing § 53a-48, we explained that "[c]onspiracy is a specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy. . . . Thus, [*p*]*roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense. . . .* In [*Padua*], the charged object of the conspiracy was to sell marijuana within 1500 feet of a public housing project. The essential elements of the crime of conspiracy to sell marijuana within 1500 feet of a public housing project are (1) intent to agree or conspire, (2) intent to sell marijuana *within 1500 feet of a public housing project*, and (3) an overt act committed in pursuance of this conspiracy. . . . Thus, it was the state's burden to establish that the defendants conspired or agreed to sell marijuana *at a specific location within 1500 feet of a public housing project . . . .*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 167–68. In *Padua*, we repeatedly observed that, to be guilty of the charged conspiracy, the defendants must have agreed not just to sell marijuana, but to sell it within 1500 feet of a public housing project, as well. See id., 179–80, 182, 183.

The defendant in the present case, taking the cited language at face value, maintains that *Padua* stands for the proposition that, to be guilty of conspiracy, one must specifically intend to commit every element of the underlying substantive, or object, offense, even when an element of that offense itself carries no specific intent requirement. The defendant asserts that this interpretation of *Padua* is consistent both with *State* v. *Williams*, 182 Conn. 262, 266, 438 A.2d 80 (1980), in which we held that a jury need not find a defendant guilty of the crimes of robbery and conspiracy to commit that robbery in the same degree, and with our statement in *State* v. *Beccia*, 199 Conn. 1, 505 A.2d 683 (1986), that, "[t]o sustain a conviction for conspiracy to commit a particular offense, the [state] must show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense.*" (Emphasis in original; internal quotation marks omitted.) Id., 4.

The state reads *Padua* differently. In *Padua*, the state posits, we merely required that the defendants have agreed to sell drugs from a geographic location that *happened to be situated* within 1500 feet of a public housing project. To be convicted of conspiracy, the defendants did not have to know that the chosen location was close to a public housing project, nor did they have to specifically intend to "violate the protected zone . . . ." In the present case, by extension, the state contends that it was not required to prove that the defendant specifically intended or agreed to the "aggra-

vating circumstance," namely, that a purported weapon would be displayed; rather, the state was required to prove only that the defendant agreed to the robbery itself.

The state's argument relies on the well established, if somewhat arcane, distinction between three types or categories of essential elements that define each criminal offense: conduct, results, and attendant circumstances. See, e.g., *State* v. *Beverly*, 224 Conn. 372, 378 n.7, 618 A.2d 1335 (1993); P. Robinson & J. Grall, "Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond," 35 Stan. L. Rev. 681, 693 (1983). Under this rubric, conduct elements encompass all of the various criminal behaviors, such as the forming of an agreement to commit a crime or the brandishing of a weapon. Results elements, by contrast, focus on the outcomes of criminal conduct, such as the death of a victim, or the subjecting of a victim to substantial risk of bodily injury. With respect to both conduct and results elements, attaching a mens rea requirement to the criminal element is typically a relatively straightforward matter.

Assignment of a mens rea requirement to an attendant circumstances element of a criminal offense, by contrast, can be more troublesome. Attendant circumstances encompass elements such as the time or location of a crime, characteristics of the perpetrator or victim (e.g., the victim's age or the perpetrator's status as a convicted felon), or circumstantial features of the weapon used (e.g., whether a firearm is registered or operational). The problem is that a person may intend or agree to commit an offense that satisfies the circumstantial element of a crime without recognizing that it does so. For instance, one may agree to commit a burglary at 7 p.m. on a particular day without knowing what time the sun will set that day and, thus, that the burglary will take place at night.[8] Similarly, one may scheme to have sexual relations with a particular woman without knowing that she has not yet reached the age of consent, or to sell drugs at a particular location without knowing its proximity to the nearest school or public housing project. When the legislature assigns a mens rea requirement to a circumstantial element of a criminal offense, then, there is a potential for ambiguity that, for the most part, does not apply to conduct and results elements. Specifically, the intent requirement may apply merely to the referential aspect of the element (e.g., the intended time, location, or victim of the crime), or it also may encompass the descriptive aspect of the attendant circumstance (e.g., the fact that the intended time, place or victim will, in fact, satisfy the circumstantial element of the crime).[9]

Returning to the certified question, we note that the state reads *Padua* to mean that, to conspire to commit an offense that includes an attendant circumstances

element, an individual need only have the requisite mens rea with respect to the referential aspects of the attendant circumstance. In the state's view, for example, criminal liability for conspiracy would lie in the previously described scenarios even if the accused did not specifically intend to carry out a *night-time* burglary, to seduce *a minor*, or to sell drugs *in a prohibited location*.

For purposes of this opinion, we assume without deciding that our decision in *Padua* does in fact carve out an exception, with respect to the descriptive aspect of attendant circumstance offense elements, to the general rule that a defendant may be found guilty of conspiracy under § 53a-48 (a) only when he specifically intends that every element of the object crime be committed.[10] We nevertheless conclude that the jury was improperly instructed in the present case, because, under the conduct-results-attendant circumstances rubric, the display element of § 53a-135 (a) (2) would describe a type of criminal conduct rather than an attendant circumstance.

The display or threatened use of a weapon is quintessential criminal conduct. See, e.g., *People* v. *Torres*, 848 P.2d 911, 915 (Colo. 1993) (display of weapon deemed actus reus of crime of disorderly conduct with deadly weapon). Nor is the display or threatened use of a weapon subject to the type of reference/description ambiguity on which the state's interpretation of *Padua* hinges. Either a conspirator intends that his associates will display a purported weapon during the planned robbery, or he does not. There is no middle ground.

To support its contention that the display of a purported weapon represents an attendant circumstance rather than a conduct element of the crime of robbery in the second degree, the state relies on various decisions of this court in which we have stated that being armed with a deadly weapon is an aggravating circumstance of the crime of robbery. See, e.g., *State* v. *Gonzalez*, 300 Conn. 490, 505, 15 A.3d 1049 (2011). The state's argument is unavailing, however, because it conflates two distinct and unrelated meanings of the term "circumstance." In the cases to which the state directs our attention, we used the term "aggravating circumstance" in a general sense to refer to any feature or characteristic of a crime the presence of which elevates the degree of the crime and thus the penalty to which the offender is subject. We also have characterized as aggravating circumstances many activities and behaviors that unequivocally fall under the rubric of conduct and that would not qualify as attendant circumstances. See, e.g., *State* v. *Rizzo*, 303 Conn. 71, 152, 31 A.3d 1094 (2011) (killing in especially cruel, heinous or depraved manner), cert. denied,    U.S.   , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012); see also *Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 783 n.14, 725 A.2d

948 (1999) (pattern of misconduct, submission of false evidence, and obstruction of disciplinary proceedings).

More directly on point are our cases construing General Statutes § 53a-49 (a), which provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if *attendant circumstances* were as he believes them to be . . . ." (Emphasis added.) In *State* v. *Cox*, 293 Conn. 234, 977 A.2d 614 (2009), we explained that the attendant circumstance provision of that statute refers to a "situation [in which] one engages in conduct which would constitute the offense if matters were as he perceived them . . . [but] some mistake in fact prevents [the conduct] from being a crime even though the actor intends to commit one." Id., 241. We provided as examples a criminal defendant who seeks to bribe a juror but mistakenly approaches a nonjuror; id., 242; or an individual who tries to shoot a police officer, unaware that his gun is broken. Id., 246. By contrast, the conduct at issue in the present case—the display of a purported weapon—cannot be the subject of that sort of mistake and thus would not qualify as an attendant circumstance. See id. (concluding that defendant's display of what he later claimed to be BB gun was not attendant circumstance for purposes of attempt statute).

Accordingly, even if we assume without deciding that the state is correct that *Padua* carved out a limited exception to the general rule that, to violate § 53a-48 (a), a coconspirator must intend that every element of the object offense be committed, the present case falls outside the ambit of that attendant circumstances exception. We therefore conclude that the Appellate Court properly determined that, under *Padua*, the trial court should have instructed the jury that, to find the defendant guilty of conspiracy to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a), it had to find that the defendant specifically intended that the robbery would involve the display or threatened use of what Harris represented to be a deadly weapon or dangerous instrument.

II

Although we conclude that the Appellate Court properly determined that *Padua* governs the present case, we recognize that, in *Padua*, we did not explain the basis for our conclusion that the legislature, in enacting § 53a-48, imposed a specific intent requirement with respect to conspiracy that may be stricter than that governing the object offense. Accordingly, we accept the invitations of the state and Judge Borden in his concurrence in the Appellate Court; see *State* v. *Pond*, supra, 138 Conn. App. 239, 251 (*Borden, J.*, concurring); to revisit the issue, and we take this opportunity to explain in greater detail the basis for our conclusion.

Well settled principles of statutory interpretation govern our analysis of § 53a-48. "Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to [the broader statutory scheme]. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 150–51, 12 A.3d 948 (2011).

A

A person is guilty of conspiracy under § 53a-48 (a) "when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." To establish a violation of § 53a-48 (a), the state must prove that three essential elements are satisfied: (1) the accused intended that conduct constituting a crime would be performed; (2) the accused formed an agreement with one or more persons to engage in such conduct; and (3) any one of the coconspirators performed some overt act in furtherance of the conspiracy. E.g., *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009). Conspiracy, then, is a "specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy." (Internal quotation marks omitted.) *State* v. *Beccia*, supra, 199 Conn. 3–4. In accordance with General Statutes § 53a-51, the penalty for conspiracy is the same as the penalty for the object offense, except that conspiracy to commit a class A felony is a class B felony.

Standing alone, the intent provision of § 53a-48 (a), that is, "with intent that conduct constituting a crime be performed," is subject to multiple interpretations. As the defendant contends, the statute reasonably can be read to require that the accused specifically intend

that each part of each element of a particular crime, the crime that forms the object of the conspiracy, be performed. However, the statutory language also could simply mean that (1) the accused must enter into the conspiracy with a criminal intent, or (2) whatever conduct the accused agrees and intends to perform must, in fact, be illegal. In other words, as the state suggests, the accused must intend to commit the general class or type of crime that constitutes the object of the conspiracy but need not intend to commit conduct constituting particular aggravating factors that determine the degree of the crime or otherwise impact the sentence imposed. Because the statutory language is subject to multiple, plausible interpretations, and it does not expressly address or resolve the certified question, § 53a-48 (a) is facially ambiguous. Cf. L. Alexander & K. Kessler, "Mens Rea and Inchoate Crimes," 87 J. Crim. L. & Criminology 1138, 1157 (1997) (recognizing ambiguity of similar conspiracy statutes).

The defendant maintains, however, that any ambiguity in the intent provision of the conspiracy statute is resolved by (1) the agreement provision of that statute, and (2) other sections of the Penal Code governing inchoate offenses. The defendant first observes that § 53a-48 (a) provides that, to conspire to commit a particular crime, a person must "[agree] with one or more persons to engage in or cause the performance *of . . . conduct [constituting the crime]* . . . ." (Emphasis added.) The defendant contends that the italicized language clearly indicates that the intent proscribed by the conspiracy statute must be the specific intent to commit the precise crime that constitutes the object of the conspiracy.

The state counters that nothing in the express language of § 53a-48 (a) dictates that, if two individuals agree and intend to commit conduct constituting simple robbery, for example, they may not be subject to a heightened penalty if the planned crime ultimately involves conduct constituting an aggravating factor such as the display of a weapon. Put differently, the state's contention is that the reference in § 53a-48 (a) to criminal conduct that constitutes the object of a conspiracy is itself subject to multiple interpretations; it may be construed broadly, in reference to a type of crime, such as robbery, or narrowly, in reference to a specific grade or degree of that crime.

The defendant also argues, however, that any ambiguities in the text of § 53a-48 (a) may be resolved by comparing the statutory language with that of General Statutes § 53a-8 (a), which governs accomplice liability, and § 53a-49 (a), which governs criminal attempt. The defendant contends, and we agree, that, if the legislature had intended to impose the same kind of strict liability for conspiracy as it did for accomplice liability and criminal attempt, it would have used the same statu-

tory language to characterize the respective mens rea requirements. It did not. Compare General Statutes § 53a-48 (a) with General Statutes §§ 53a-8 (a) and 53a-49 (a).

The legislature adopted the relevant language of the three sections of the Penal Code at the same time, in the same public act. See Public Acts 1969, No. 828, §§ 8, 48 and 50. Section 53a-8 (a) defines the state of mind required to be an accessory to a crime as "the mental state required for commission of an offense . . . ." Section 53a-49 (a) likewise provides that, to attempt to commit a crime, one must act "with the kind of mental state required for commission of the crime . . . ." In both cases, the legislature expressly provided and clearly intended that the mens rea requirement for aiding in the commission of or attempting to commit a crime shall be no different from the mens rea requirement for the commission of a crime by a principal. By contrast, § 53a-48 (a) provides that the mens rea requirement for conspiracy is the "intent that conduct constituting a crime be performed . . . ." It is well established that, when construing statutes, we presume that the legislature has created a harmonious and consistent body of law. E.g., *Renaissance Management Co.* v. *Connecticut Housing Financial Authority*, 281 Conn. 227, 238, 915 A.2d 290 (2007). Furthermore, when "a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003). In the present case, the legislature, in defining the requisite intent for conspiracy in § 53a-48 (a), declined to use the language from §§ 53a-8 (a) and 53a-49 (a) providing that the intent necessary to violate those statutes is identical to the "mental state required for commission of" the underlying offense. We presume that this choice of statutory language was purposeful and, therefore, that the legislature did not intend that the mens rea requirement for conspiracy would mirror that of the object offense. Accordingly, we agree with the defendant that the decidedly most reasonable interpretation of § 53a-48 (a) is that, to conspire to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48, a defendant must specifically intend that the planned robbery will involve the display or threatened use of a purported weapon.

B

The state nevertheless maintains that, if the legislature had intended to require that the state prove a greater mens rea for conspiracy to commit robberies than for the robberies themselves, it would have done so expressly, and that its failure to do so is the clearest indication of the intent of § 53a-48 (a). The state also

contends that construing the statute as we did in *Padua* leads to absurd results. In light of these claims, we look to extratextual sources to confirm that our interpretation of the statutory language does not depart from the intent of the legislature. These sources include the legislative policy the statute was designed to implement, the legislative history and circumstances surrounding the enactment of the statute, the relationship of the statute to other legislation and common-law principles governing the same general subject matter. E.g., *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 399, 999 A.2d 682 (2010).

In this case, neither party has brought to our attention, and our own review has not identified, anything in the legislative history of § 53a-48 (a) that would resolve the textual ambiguity or clarify the legislature's intent.[11] Rather, the parties have focused their attention on two issues: (1) whether the legislature, in enacting § 53a-48 (a), could reasonably have intended to impose a stricter mens rea requirement for conspiracy than that required to commit the crime that constitutes the object of that conspiracy; and (2) whether construing § 53a-48 (a) in such a manner would be consistent with the provisions of the Penal Code governing accessorial liability. We answer both questions in the affirmative.

1

The state first maintains that the legislature could have had no plausible rationale for requiring that a person intend that a purported weapon be displayed in order to subject him to criminal liability for conspiracy to commit robbery in the second degree, when the law imposes no such specific intent requirement for the robbery itself. Interpreting the statute in such a manner, the state contends, would lead to the absurd result of requiring that the state prove a more specific mens rea to obtain a conviction for conspiracy than that required for obtaining a conviction for the commission of the plotted offense or serving as an accessory thereto. The defendant responds that, because the crime of conspiracy is defined and its punishment is determined with respect to the specific object offense at which the illegal agreement is directed, it would make no sense to subject a person to conviction for conspiring to commit crimes that he neither planned nor agreed to commit. We agree with the defendant.

To understand why the intent provision of § 53a-48 (a) must be interpreted as the defendant contends, it is important to recognize the extent to which conspiracy differs fundamentally from the substantive crimes that may constitute its object. Broadly speaking, the law proscribes two stages of the criminal process: (1) the actual—or attempted—commission of a crime; and (2) prior conduct aimed at planning, preparing for, or soliciting participation in such a crime. There are a number of well established differences in how the law treats

these two stages of the criminal endeavor, reflecting the different evils at which the respective prohibitions are directed.

Substantive crimes such as robbery are prohibited, first and foremost, because of the direct harms that they inflict on the victims, whose rights to be free in their persons and property are thereby impaired. For example, the commentary to the Penal Code indicates that "[t]he basic rationale [for the criminalization of robbery] is protection against the terror of the forcible taking." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-133 (West 2012) comment, p. 209. Because of these tangible and apparent harms, as well as the ever present risk that an attempted or completed crime will lead to further, unanticipated injuries to the intended victims, bystanders, or public safety officers, most substantive crimes such as robbery have been recognized in one form or another since the earliest days of human civilization. See, e.g., Code of Hammurabi § 22 ("[i]f a man has committed highway robbery and has been caught, that man shall be put to death"), reprinted in C. Kent, Israel's Laws and Legal Precedents (1907) p. 297.

Anticipatory crimes such as conspiracy are different. As we explained in *State* v. *Johnson*, 162 Conn. 215, 292 A.2d 903 (1972), "[t]he commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes. . . . [This reflects the fact that] [t]he crime of conspiracy . . . has characteristics and ingredients which separate it from all other crimes." (Citations omitted.) Id., 219. Unlike substantive crimes such as robbery, for example, conspiracy has no direct victims. Rather, "[t]he gravamen of the crime of conspiracy is the unlawful combination . . . . The prohibition of conspiracy is directed not at the unlawful object . . . but at the process of agreeing to pursue that object." (Citations omitted; internal quotation marks omitted.) *State* v. *Beccia*, supra, 199 Conn. 3. Because conspiracy consists primarily of a meeting of minds and a criminal intent, "[i]t is always predominantly mental in composition . . . ." (Internal quotation marks omitted.) *Krulewitch* v. *United States*, 336 U.S. 440, 447–48, 69 S. Ct. 716, 93 L. Ed. 790 (1949) (Jackson, J., concurring). A defendant can be convicted of conspiracy, therefore, even if the criminal plot never comes to fruition. See, e.g., *State* v. *Flores*, 301 Conn. 77, 96–97, 17 A.3d 1025 (2011).

Unlike the substantive offenses that constitute its objects, the crime of conspiracy itself is of relatively modern origins. The notion that one may be punished merely for agreeing to engage in criminal conduct was unknown to the early common law. 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 12.1 (a), p. 254. Until the late seventeenth century, the only recognized form of criminal conspiracy was an agreement to make

false accusations or otherwise to misuse the judicial process. See id. And it was not until the nineteenth century that courts in the United States began to view conspiracies as distinct evils. S. Morrison, "The System of Modern Criminal Conspiracy," 63 Cath. U. L. Rev. 371, 380 (2014). In part, this reflects the law's traditional hesitance to criminalize ideation and communication in the absence of actual criminal conduct. See S. Kadish et al., Criminal Law and Its Processes: Cases and Materials (8th Ed. 2007) p. 191.

That criminal conspiracies ultimately came to be seen as crimes in their own right reflects the fact that joint criminal plots pose risks to society that, if not unique, are undoubtedly greater than those posed by lone-wolf, would-be felons. Conspiracies may bolster the resolve of their members; they may benefit from the division of labor in the execution of criminal schemes; and they may lead to the commission of additional crimes beyond those initially envisioned. Cf. *Krulewitch* v. *United States*, supra, 336 U.S. 448–49 (Jackson, J., concurring); *State* v. *Rodriguez*, 107 Conn. App. 685, 707, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008). The predominantly ideational nature of a criminal conspiracy, however, together with the distinct harms that the conspiracy laws seek to avert, provides several answers to the question why the legislature would have imposed a higher mens rea requirement for conspiracies than for the underlying substantive offenses.

First, it stands to reason that the legislature would have imposed a higher intent requirement for conspiracy than for some substantive crimes because conspiracy, by its very nature, is "predominantly mental in composition . . . ." (Internal quotation marks omitted.) *Krulewitch* v. *United States*, supra, 336 U.S. 447–48 (Jackson, J., concurring); see also *State* v. *Johns*, 184 Conn. 369, 379, 439 A.2d 1049 (1981) ("[t]he essence of the conspiracy charge is the illegal agreement"). In contrast to most substantive crimes, which are defined principally by their actus rei, or guilty acts, the actual conduct required to establish a conspiracy is relatively minimal. See, e.g., S. Morrison, supra, 63 Cath. U. L. Rev. 408. Although it is true that § 53a-48 (a) requires that one of the coconspirators have performed an overt act in furtherance of the conspiracy, such overt act may be de minimus, it may itself be a legal and innocuous activity, and it need not be personally performed by the accused. See, e.g., *State* v. *Fuller*, 58 Conn. App. 567, 580, 754 A.2d 207, cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000); *State* v. *Trumbull*, 1 Conn. Cir. Ct. 454, 467, 187 A.2d 445 (App. Div.), cert. denied, 150 Conn. 711, 204 A.2d 935 (1962); S. Morrison, supra, 408. Moreover, the agreement itself need not be overt or formal, and may be established purely by inference. See *State* v. *Millan*, supra, 290 Conn. 825–26. Accordingly, just as the legislature has imposed more stringent actus reus requirements for substantive offenses that are

defined principally with respect to their conduct elements, so may it reasonably demand a greater showing of wrongful intent for an anticipatory, inchoate crime such as conspiracy, which predominantly criminalizes the wrongful scheme. "[T]he law makes up, as it were, for the deficiency in the actus reus of the crime by insisting on a greater degree of mens rea." (Footnote omitted.) J. Stannard, "Making Up for the Missing Element—A Sideways Look at Attempts," 7 Legal Stud. 194, 194 (1987).

Second, on the most basic level, it makes sense to impose a specific intent requirement for conspiracy to commit robbery in the second degree, but not for robbery in the second degree, because one crime actually involves the display or threatened use of a purported weapon and the other does not. The substantive crime of robbery in the second degree, as defined in § 53a-135 (a) (2), requires that, in the course of a robbery or immediate flight therefrom, the defendant or another perpetrator display or threaten the use of what is represented to be a deadly weapon or a dangerous instrument. An accomplice to an actual or attempted robbery may be held criminally liable for his associate's display or threatened use of a purported weapon and thus convicted of the more serious crime of robbery in the second degree, even if he did not intend or even know that such a display would occur. See *State* v. *Gonzalez*, supra, 300 Conn. 506. In defining the various degrees of the crime of robbery, the legislature has made a reasonable determination that, if an individual willingly participates in a robbery or attempted robbery, during which one of the perpetrators *actually* threatens the use of deadly force, that individual should be held criminally liable for the increased risk that injury or death will result, even if he did not specifically intend for the threat to be made.

It makes little sense, however, to say that, if an individual plans and agrees to participate in a simple, unarmed robbery, he then may be held criminally liable for *planning or agreeing to* an armed robbery, or one in which a purported weapon is displayed or its use threatened, when he had no such intention and agreed to no such plan. Such an interpretation of § 53a-48 (a) would lead to results that are both absurd and unwelcome. For one thing, the state's interpretation would obliterate the distinction between conspiracy to commit robbery in the first, second, and third degrees. As we previously noted, conspiracy neither requires nor entails the commission or attempted commission of the object offense. See *State* v. *Flores*, supra, 301 Conn. 96–97. The crime has only three essential elements: an agreement to engage in unlawful conduct, the intent to commit a crime, and some minimal overt act evidencing that the illicit plan amounts to more than mere phantasy. See, e.g., *State* v. *Millan*, supra, 290 Conn. 825. All that distinguishes *conspiracy* to commit robbery in

the first, second, and third degrees, then, is the object offense, that is, whether the conspirators' *intent* was to commit a crime involving the use of an actual or purported weapon. The *actual* use or display of a weapon or purported weapon is not an element of those crimes. See *State* v. *Johns*, supra, 184 Conn. 379; see also *State* v. *Beccia*, supra, 199 Conn. 3 ("[t]he gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy" [internal quotation marks omitted]). If, as the state proposes, one could be found guilty of conspiracy to commit robbery in the second degree merely by virtue of agreeing and planning to commit simple, third degree robbery, then the elements of those two crimes would be identical, and there would be no legal distinction between them.

Pragmatically, the state's interpretation of § 53a-48 (a) could lead to unintended and undesirable consequences. Under the state's reading of the statute, an individual who plans a simple, unarmed robbery nevertheless can be convicted of the more serious crime of conspiracy to commit robbery in the first or second degree if weapons are ultimately used without his knowledge or consent. In other words, even if, during the planning stages of a robbery, the accused vigorously and at that time successfully beseeches his coconspirators not to display or use actual or purported weapons during the contemplated crime, he nevertheless may be convicted and sentenced just as if he had championed their display or use if his coconspirators ultimately engaged in such conduct. The reason the law punishes conspiracies to commit armed robberies more severely is to discourage would-be felons from planning this more dangerous class of crime. The state's proposed interpretation of the statute would eliminate any such disincentive.

Third, we presume that the most straightforward reading of the statutory language is the correct one and that the accused must have specifically intended every element of the planned crime, because a contrary interpretation of § 53a-48 (a) would create the potential for abuse. When the state prosecutes a conspiracy, particularly one that never has ripened into an actual crime, it seeks to punish behavior—thought, speech, and collaboration—that would be legal if not for its illicit design. It is only the fact that the agreement is directed at a criminal object that renders it criminal. Moreover, the legislature has determined that conspirators shall be subject to punishment only in proportion to the seriousness of the offense planned. See General Statutes § 53a-51 (conspiracy is crime of same grade and degree as most serious offense that is object of conspiracy). We see no reason, then, why the state should not be made to demonstrate that an individual accused of conspiring to commit a class C felony, and facing a

possible sentence reflective of that more serious crime, actually agreed and intended to carry out such a crime. To require less would permit the state to prosecute a person who conspires with a would-be pickpocket, shoplifter or library book bandit for conspiracy to commit an armed felony without proving that that person either intended to or did in fact engage in such a crime.

Of course, the state is not arguing that an individual who has conspired to commit a simple, unarmed robbery can, on that basis alone, be convicted of robbery in the first or second degree. Rather, we understand the state's position to be that, when an individual agrees to the commission of a simple robbery, and when the coconspirators then follow through and attempt to put the conceived plan into effect, that individual becomes strictly liable for any unanticipated escalation of the robbery, just as he would be criminally liable therefor as an accessory or accomplice. There are several problems with this reading of the statute.

One problem is that, as we previously discussed, the crime of conspiracy is targeted not at the underlying substantive crime but at the illicit agreement itself. Before adopting the state's interpretation of the statute, then, we would require a clear indication that the legislature intended to calibrate the punishment of conspiracies according to the vagaries of the resulting crime, if any, rather than according to the scope of the criminal agreement itself. The state has made no such showing.

Another problem is that there simply is no need for the state's proposed rule. The state has § 53a-48 (a) at its disposal to prosecute criminal agreements, and various substantive criminal statutes are available to punish any crimes borne of such agreements. If a conspiracy culminates in an actual robbery, or an attempted robbery, each participant in or accessory to that robbery may be convicted under General Statutes §§ 53a-134, 53a-135, or 53a-136, as appropriate, depending on the actual criminal conduct involved. Thus, if one participant decides to brandish a gun in what had been planned as an unarmed robbery, his accomplices may be convicted of robbery in the first degree for their role in the crime, regardless of their knowledge or intention with regard to the weapon. See *State* v. *Gonzalez*, supra, 300 Conn. 506; see also General Statutes § 53a-8. Moreover, to the extent that it was reasonably foreseeable that a member of the conspiracy might unilaterally depart from the plan and use a firearm during the crime, every member of the conspiracy—even those who do not directly participate in the robbery—could be convicted of the more serious robbery charge, based on a *Pinkerton*[12] theory of liability.[13] When the object offense is actually attempted or committed, then, the state has more than adequate remedies at its disposal to hold each coconspirator criminally liable in proportion to the seriousness of the crime.

The problem in the present case is that the state failed to secure a conviction on the substantive charge. The jury unanimously found the defendant not guilty of attempt to commit robbery in the second degree. There has been no finding, then, that any substantive crime ever was attempted or committed. What the state seeks is, in essence, a second bite at the apple. It seeks to bootstrap a conviction by taking the position that, even if the defendant agreed only to commit a third degree, unarmed robbery, and even though the jury rejected the state's theory that he attempted to commit a robbery involving the display or threatened use of a purported weapon, he nonetheless was properly convicted of conspiracy to commit robbery in the second degree solely on the basis of those allegations. Imposing liability under those circumstances and to that extent would turn *Pinkerton* on its head and dramatically expand the already broad reach of conspiracy law. We decline to reach such a result, at least in the absence of a clear indication of legislative authorization.

We next address the state's contention that its interpretation of § 53a-48 (a) is consonant with the Model Penal Code, on which Connecticut's Penal Code is modeled; see *State* v. *Courchesne*, 296 Conn. 622, 671–72, 998 A.2d 1 (2010); and also with the conspiracy law of other jurisdictions. We disagree with this contention. Considering first the Model Penal Code, the provision corresponding to § 53a-48 (a) is Model Penal Code § 5.03 (1), which provides in relevant part: "A person is guilty of conspiracy . . . to commit a crime if with the purpose of promoting or facilitating its commission he: (a) agrees . . . that . . . one or more of [the conspirators] will engage in conduct that constitutes such crime . . . ." 2 A.L.I., Model Penal Code and Commentaries (1985) § 5.03 (1), pp. 382–83.

The Model Penal Code's treatment of the question presented in this appeal turns on the distinction we previously have discussed between the three types of "elements of an offense," namely conduct, results, and attendant circumstances. See 1 id., § 1.13 (9), p. 209. The American Law Institute's explanatory note to § 5.03 (1) provides that "[g]uilt as a conspirator is measured by the situation *as the actor views it*; he must have the purpose of promoting or facilitating a criminal offense . . . . *The purpose requirement is meant to extend to result and conduct elements of the offense that is the object of the conspiracy*, but whether or how far it also extends to circumstance elements of that offense is meant to be left open to interpretation by the courts." (Emphasis added.) 2 id., § 5.03 (1), explanatory note, p. 384. The American Law Institute elaborates in the comments to § 5.03: "It is worth noting, further, that in relation to those elements of substantive crimes that consist of proscribed conduct or undesirable results of conduct, the [Model Penal] Code requires purposeful

behavior for guilt of conspiracy, *regardless of the state of mind required by the definition of the substantive crime. . . .* [T]he actor's purpose must be to promote or facilitate the engaging in of such conduct by himself or another." (Emphasis added.) Id., comment 2, p. 407. More generally, the drafters of the Model Penal Code made clear that one of their primary purposes in framing the conspiracy provisions as they did was "to focus inquiry on the culpability of the actor whose liability is in issue, rather than on that of the group of which he is alleged to be a part." Id., comment 1, p. 393. Thus, the Model Penal Code categorically rejects the state's theory that conspiracy carries no greater mens rea requirement than that of the object crime. Rather, the Model Penal Code requires that the accused have the specific purpose—that is, intent—to accomplish each conduct and results element of the planned offense. The fact that the Model Penal Code takes no position with respect to the mens rea requirement governing attendant circumstances elements is of little moment, because, as we already have explained, the display or threatened use of a purported weapon is clearly a conduct element of § 53a-135 (a) (2).

Nor are we aware of any instance in which a court interpreting a conspiracy statute founded on the Model Penal Code has applied the rule for which the state advocates in the present case. To the contrary, other courts repeatedly have held that criminal liability for conspiracy lies only when the accused specifically intended to commit every element of the plotted offense.

New York law is particularly instructive in this regard. See Commission to Revise the Criminal Statutes, supra, Conn. Gen. Stat. Ann. § 53a-48a, comment, p. 10 (language of Connecticut conspiracy statute is based on revised New York Penal Law); see also *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990) (because drafters of Connecticut Penal Code " 'relied heavily' " on New York Penal Law, Connecticut courts look to New York law for guidance in interpreting ambiguous criminal statutes). *People* v. *Joyce*, 100 App. Div. 2d 343, 474 N.Y.S.2d 337, appeal denied, 62 N.Y.2d 807 (1984), a decision of the Appellate Division of the New York Supreme Court, is squarely on point with respect to the present case. In *Joyce*, the defendant, Robert Patrick Joyce, was convicted of conspiracy in the fourth degree, in violation of New York Penal Law § 105.10 (McKinney Supp. 1979), on the basis of charges that he had conspired to commit burglary in the second degree. Id., 344; see id., 346. One element of the latter crime was that, during a burglary, the accused or another participant display what appears to be a firearm. See N.Y. Penal Law § 140.25 (1) (d) (McKinney 1981). Under New York law, one need not intend or even know that a coparticipant in a burglary plans to display a purported firearm to be held criminally liable as an accomplice

in the substantive offense. See *People* v. *Joyce*, supra, 347 n.*. With regard to conspiracy to commit that crime, however, the court interpreted "the plain language" of N.Y. Penal Law § 105.10 (McKinney Supp. 1979),[14] which is substantially similar to § 53a-48, to mean that "the [government was required] to prove beyond a reasonable doubt that [Joyce] agreed to the display of what would appear to be a firearm." Id., 347.[15]

Other courts have reached the same conclusion as *Joyce*. See, e.g., *People* v. *Mass*, 464 Mich. 615, 643–44, 628 N.W.2d 540 (2001); *State* v. *Rodriguez*, 164 N.H. 800, 812, 64 A.3d 962 (2013); *State* v. *Suggs*, 117 N.C. App. 654, 661–62, 453 S.E.2d 211 (1995). English law also is relevant to our resolution of the certified question. Section 1 (2) of chapter 45 of the Criminal Law Act, 1977,[16] provides: "Where liability for any offence may be incurred without knowledge on the part of the person committing it of any particular fact or circumstance necessary for the commission of the offence, a person shall nevertheless not be guilty of conspiracy to commit that offence . . . unless he and at least one other party to the agreement intend or know that that fact or circumstance shall or will exist at the time when the conduct constituting the offence is to take place." Although not controlling, the fact that each of these jurisdictions has expressly adopted the principle that, to be criminally liable for conspiracy, one must specifically intend every element of the object offense seriously undermines the state's contention that such a rule amounts to an "absurdity . . . ."

The state next contends that its interpretation of § 53a-48 (a) finds support in federal conspiracy law. Specifically, the state argues that *United States* v. *Feola*, 420 U.S. 671, 95 S. Ct. 1255, 43 L. Ed. 2d 541 (1975), stands for the proposition that federal conspiracy law imposes no greater mens rea requirement than that of the substantive offense that constitutes the object of an alleged conspiracy. *Feola*, however, is readily distinguishable from the present case. In *Feola*, the respondent was convicted of violating the federal conspiracy statute, 18 U.S.C. § 371 (1970),[17] on the basis of his role in a scheme to assault and rob several purported heroin buyers who, unbeknownst to him, were undercover federal agents. See *United States* v. *Feola*, supra, 674. The offense charged as the object of the conspiracy was assault of a federal officer engaged in the performance of his official duties. 18 U.S.C. § 111 (1970); see *United States* v. *Feola*, supra, 672–73. On appeal, the United States Supreme Court concluded that, to be convicted of the underlying substantive offense, the offender need not understand that the victim of his assault is a federal officer. *United States* v. *Feola*, supra, 676, 684. The court reasoned that that element of the substantive offense merely serves as the hook needed to confer federal jurisdiction and that Congress intended that federal officers, who might be engaged

in locally unpopular law enforcement operations, would have the full protection of federal as well as state assault laws. See id., 683–84. For similar reasons, the court also concluded that one may *conspire* to violate 18 U.S.C. § 111 (1970) without having the specific intent to assault a federal agent. See id., 695–96.

We do not read *Feola* to apply to statutory provisions such as the one at issue in the present case. Any comparison between the federal and Connecticut conspiracy statutes is extremely problematic in light of their radically different penalty provisions. Under § 53a-51, conspiracy is punishable by a prison term not to exceed the maximum term for the object offense, except in the case of conspiracy to commit a class A felony. Under 18 U.S.C. § 371, by contrast, a conspiracy to commit a felony is punishable by a prison term not to exceed five years, regardless of the degree or seriousness of that felony. See 18 U.S.C. § 371 (1970); see also 18 U.S.C. § 371 (2012) (same). Accordingly, because punishment for violation of the federal statute does not depend on the degree of the object offense, the United States Supreme Court, in construing that statute, simply was not confronted with the issue presented by this appeal: whether a coconspirator must intend the conduct constituting the aggravating factors that increase the degree of a crime before he may be subjected to increased punishment on the basis of the presence of those factors.

We also agree with the defendant that *Feola* stands only for the limited proposition that one need not intend an attendant circumstance element of a crime the primary purpose of which is to confer federal jurisdiction. See *United States* v. *Feola*, supra, 420 U.S. 685, 687, 692–94 (distinguishing crime elements based on status or identity of intended victim from those relating to nature and seriousness of illicit acts or conduct); see also id., 696 ("[when] knowledge of the facts *giving rise to federal jurisdiction* is not necessary for conviction of a substantive offense embodying a mens rea requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense" [emphasis altered]). Finally, the court in *Feola* repeatedly emphasized that a criminal agreement is no more blameworthy, and the object offense no more dangerous or opprobrious, simply because the participants are aware that the offense will violate federal as well as state law. See id., 693. The clear implication is that a different outcome would be appropriate when, as in the present case, the seriousness of the offense is precisely what is at issue. Nothing in *Feola*, then, suggests that a person may be held liable for a higher degree of conspiracy, and thus exposed to a more severe penalty, for having conspired to commit a crime involving conduct constituting an aggravating factor that he neither approved of nor intended.

Accordingly, our review of the statutory text, the public policies that animate the law of conspiracy, and persuasive authority from other jurisdictions all compel the conclusion that, under § 53a-48 (a), the state must prove that a person accused of conspiracy to commit robbery in the second degree specifically intended that every element of that offense be committed.

2

We next address the state's argument that it would have been irrational for the legislature to adopt a legislative scheme in which offenders face broad vicarious liability for their roles in first and second degree robberies—whether as participants, accessories or, under a *Pinkerton* theory, coconspirators—and yet to stop short of extending that same vicarious liability to the crime of conspiracy itself under § 53a-48 (a). In this opinion, we already have indicated a number of rationales for this distinction.

First, there is a fundamental difference between holding a person liable for his role in an actual crime, whatever that role might be, as opposed to punishing him solely for agreeing to commit a crime. "[T]he conspiracy doctrine will incriminate persons on the fringe of offending who would not be guilty of aiding and abetting or of becoming an accessory, for those charges . . . lie [only] when an act which is a crime has actually been committed." *Krulewitch* v. *United States*, supra, 336 U.S. 450 (Jackson, J., concurring). There are sound historical, practical and theoretical reasons for imposing stricter liability in the latter case than in the former. See, e.g., *People* v. *Luciano*, New York Supreme Court, Docket No. 5715/11 (N.Y. Sup. April 27, 2012) ("It is one thing to hold a defendant who intends to commit a robbery liable for a limited number of the common unintended consequences of that crime. It is another to punish a person for entering into an agreement to do something he never agreed to do.").

Second, under *Pinkerton*, coconspirators are already held vicariously liable for crimes in which their coconspirators' use of weapons or purported weapons is reasonably foreseeable. The state's proposed rule would represent a substantial expansion of, rather than a mere corollary to, that principle. *Pinkerton* liability is forward looking, holding conspirators liable as principals for crimes that predictably result from an already formed and clearly defined conspiracy. The state's proposed rule, by contrast, would create a legal anachronism: it turns back the clock and rewrites the terms of the conspirators' original criminal agreement to reflect conduct that coconspirators are alleged to have *subsequently* performed. Such a rule would substantially ease the burden on the state in prosecuting an alleged conspiracy, creating what would, in effect, be a presumption that conspirators agreed in advance to conduct

constituting any aggravating factors that are alleged to have subsequently transpired. There is no indication that the legislature intended to adopt that sort of "in for a penny, in for a pound" theory of conspiracy.[18]

C

For all of the foregoing reasons, we conclude that, in order to convict a defendant of conspiracy to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a), the state must prove that the defendant specifically agreed that there would be the display or threatened use of what was represented as a deadly weapon or dangerous object during the robbery or immediate flight therefrom. We therefore agree with the Appellate Court that the defendant is entitled to a new trial before a properly instructed jury.[19]

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and ZARELLA, EVELEIGH, McDONALD and ROBINSON, Js., concurred.

[1] Under General Statutes § 53a-51, the penalty for conspiracy, like the penalty for attempt, is the same penalty "as the most serious offense which is . . . an object of the conspiracy, except that . . . conspiracy to commit a class A felony is a class B felony."

[2] General Statutes (Rev. to 2007) § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery . . . and . . . (2) in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument."

Hereinafter, all references to § 53a-135 are to the 2007 revision.

[3] The trial court imposed a sentence of five years imprisonment, execution suspended after fifteen months, and three years of probation.

[4] For the sake of brevity, we sometimes refer to this element of the crime of robbery in the second degree as the display of a purported weapon.

[5] Thereafter, the defendant claimed, as an alternative ground for affirming the judgment of the Appellate Court; see Practice Book § 84-11; that there is a reasonable probability that certain of the trial court's jury instructions misled the jury. Because we affirm the judgment of the Appellate Court on the ground raised in the certified question, we need not address the defendant's alternative ground for affirmance.

[6] Under Connecticut law, larceny involves the wrongful taking, obtaining, or withholding of another person's property with the intent to deprive that other person of that property or to appropriate the same to himself or a third person. See General Statutes § 53a-119. Larceny is graded primarily on the basis of the value and type of property appropriated. See generally General Statutes §§ 53a-119, and 53a-121 through 53a-125b. Robbery entails the use or threatened use of force in the course of committing a larceny; see General Statutes § 53a-133; and is graded primarily on the basis of the type of force or threat applied. See generally General Statutes §§ 53a-134 through 53a-136a.

The parties do not dispute that, in order to conspire to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a), one must specifically intend not only that a larceny occur, but also that force be used or threatened with the intent either to overcome resistance or to compel delivery of the victim's property. See General Statutes § 53a-133; General Statutes (Rev. to 2007) § 53a-135 (a) (2); cf. *State* v. *Avila*, 223 Conn. 595, 603, 613 A.2d 731 (1992).

[7] Because the defendant failed to raise this instructional claim at trial, he sought to prevail on appeal under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *State* v. *Pond*, supra, 138 Conn. App. 236. He contended that the omitted part of the instruction involved an essential element of the charged crime and, therefore, that its omission from the court's instructions to the jury represented a constitutional violation. Id.

[8] Prior to 2008, one element of burglary in the second degree was that the crime be committed at night. General Statutes (Rev. to 2007) § 53a-102

(a) (1).

[9] For a discussion of the potential for this sort of ambiguity that characterizes so-called "opaque" verbs such as "intend," see generally J. Anderson, "Misreading Like a Lawyer: Cognitive Bias in Statutory Interpretation," 127 Harv. L. Rev. 1521 (2014).

[10] We note that the state's interpretation of *Padua* as carving out an exception for attendant circumstances elements hinges on the questionable hypothesis that, if we had meant to require that the defendants in that case actually intended to sell drugs within 1500 feet of a public housing project, we could not have found the instructional error in question to be harmless. This is true, the state contends, because there was no evidence in the record in *Padua* that the defendants specifically intended to sell drugs in a protected zone. The state, however, overlooks the fact that those defendants apparently resided in the public housing project from which they sold drugs over a matter of months. See *State* v. *Padua*, 73 Conn. App. 386, 411–12 n.6, 808 A.2d 361 (2002), rev'd, 273 Conn. 138, 869 A.2d 192 (2005). The state's theory, then, rests on the rather tenuous assumption that the defendants in *Padua* might not have understood that they lived in a public housing project.

[11] The commentary to the Penal Code does indicate that § 53a-48 differs from its predecessor. The commentary provides that the following change appeared in § 53a-48: "the requirement that the defendant must have a specific intent to agree in the performance or causation of criminal conduct. A general intent to promote or facilitate the criminal object or means is not sufficient to establish guilt." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-48 (West 2012) comment, p. 10. The commentary offers no further guidance, however, as to the scope of that specific intent requirement.

[12] v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

[13] In *State* v. *Walton*, 227 Conn. 32, 43, 45–46, 630 A.2d 990 (1993), we recognized the principle of vicarious liability that the United States Supreme Court articulated in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), under which conspirators may be held liable for criminal offenses committed by their coconspirators that are (1) within the scope of the conspiracy, (2) in furtherance of it, and (3) reasonably foreseeable as a necessary or natural consequence of the conspiracy.

[14] New York Penal Law § 105.10 (McKinney Supp. 1979) provides in relevant part: "A person is guilty of conspiracy in the fourth degree when, with intent that conduct constituting:

"1. a class B or class C felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct . . . ."

[15] The state's efforts to distinguish *Joyce* are unavailing. The state refers to dictum in *Joyce* indicating that, in the case of a general conspiracy statute that does not identify a particular class of object felonies, it "may be appropriate" to adopt the rule that "one who joins a conspiracy after its inception, knowing of its central criminal design, may be held accountable for the actions and declarations of his coconspirators which occurred *before* his entry into the conspiracy . . . ." (Citations omitted; emphasis added.) *People* v. *Joyce*, supra, 100 App. Div. 2d 347. That possible exception to the general rule for which *Joyce* stands is inapplicable to the present case.

[16] The statutory language has since been amended in ways not relevant to the present discussion. See Armed Forces Act, 2006, c. 52, § 45 (U.K.).

[17] Title 18 of the 1970 edition of the United States Code, § 371, provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

[18] For all of the reasons discussed herein, we are unpersuaded by the dissenting opinion. In light of the criticisms leveled by the dissenting justice, however, we take this opportunity to underscore that our holding in this case does not require that the state prove the existence of a formal conspiracy. Nor must the state prove that the defendant knew all of the details of the planned crime. There must, however, be at least circumstantial evidence that the defendant intended those aspects of the object offense that constitute its essential elements and determine the penalty to which an offender is potentially subject.

[19] On appeal, the state does not challenge the Appellate Court's conclusion

that the trial court's failure to so instruct the jury constituted harmful error.